AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
SEP 03 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JCS

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Ewelina Sczendzina, | ) | Case No. 3 19 71434 |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __February 12, 2018__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:
Please see attached affidavit.

UNDER SEAL

☑ Continued on the attached sheet.

Approved as to form: ___/s/___
WILLIAM FRENTZEN
Assistant United States Attorney

___/s/ James Gawrych___
*Complainant's signature*

James Gawrych, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __9/3/19__

___/s/___
*Judge's signature*

City and state: __San Francisco, California__ Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, James Gawrych, Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, hereby depose and state as follows:

I. **INTRODUCTION**

A. **SYNOPSIS**

1. I submit this affidavit in support of a criminal Complaint for EWELINA SCZENDZINA ("SCZENDZINA").

2. There is probable cause to believe SCZENDZINA, while employed as a marketer at a home health agency in Fremont, California, engaged in a scheme to commit Medicare fraud by accepting kickbacks in exchange for the agreement to send Medicare patient referrals, in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE").

4. During the course of the investigation, CW-1 and the UCE held multiple in-person audio and video recorded conversations with SCENDZINA in 2017 and 2018, in which SCENDZINA received kickback payments, in the form of cash, in exchange for agreeing to refer home health and/or hospice patients. SCENDZINA also offered to introduce CW-1 and the UCE to other individuals willing to engage in the scheme.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

**B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION**

5.       Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

6.       An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments.

7. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

8. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

9. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a

likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT BACKGROUND

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

10. I am a Special Agent of the Federal Bureau of Investigation and have been so employed for approximately two years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Office. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime ("WCC"). I have received specialized training in health care fraud matters, intellectual property rights violations, and complex financial crimes. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

11. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

12. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

13. SCZENDZINA, is a 42 year old female believed to reside in Gilroy, California. SCZENDZINA was a marketer for We Care Home Health And Hospice, Inc. ("WE CARE"), a home health agency located in Fremont, CA.

14. While employed as a marketer at WE CARE, SCZENDZINA accepted kickback payments in the form of cash from UCE and CW-1 in exchange for the promised referral of home health and/or hospice patients to HHA Alpha. SCZENZINA also facilitated the payment of kickbacks by introducing UCE and CW-1 to health care professionals willing to engage in the scheme.

### E. STATUTES VIOLATED

5

15. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly, or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. SCZENDZINA ACCEPTS KICKBACKS IN EXCHANGE FOR THE REFERRAL OF PATIENTS

16. Through CW-1's position at HHA Alpha, CW-1 became familiar with SCZENDZINA. CW-1 introduced SCZENDZINA to the UCE as an individual who was willing to accept kickback payments in exchange for the referral of patients and introduce others willing to participate in a kickback for patient referral scheme.

17. On May 26, 2017, CW-1 met with SCZENDZINA to discuss CW-1's and UCE's business plan and kickback scheme. SCZENDZINA acknowledged she was aware of other HHAs, specifically AMITY HOME HEALTH CARE ("AMITY"), an HHA located in Hayward, California, who payed kickbacks for patient referrals. Set forth below is an excerpt of their conversation:

| Speaker | Statement | Additional Explanation[6] |
|---|---|---|
| CW-1: | And the only dilemma that I have with that is the … fifty doctors I'm working with are good are clean. The fifty other doctors that I want are working with …how do I get to them? … They still don't talk to me because they think I'm still [HHA ALPHA] but … I cannot wait for many months and then announce okay I'm over and now we are on the same game. Makes sense? … | "clean" is a reference to doctors who do not accept kickbacks. CW-1 is describing he is planning on taking over HHA Alpha but he cannot wait to start paying kickbacks until he takes over. CW-1 indicates he is still employed by HHA Alpha but he wants to start paying kickbacks now and wants SCZENDZINA to refer him to physicians who are willing to accept kickbacks. |

---

[6] The "Additional Explanation" columns in this affidavit provide my summary opinion and/or explanation of the adjacent text in the "Statement" column. My summary opinion and/or explanation is based on my training and experience of the criminal statutes violated and of the UCO.

6

| SCZENDZINA: | Well I can tell you why I can tell you already why some of these doctors are working for AMITY ... but they are on the payroll you know | SCZENDZINA is referring to AMITY paying kickbacks to doctors. |
|---|---|---|
| ... | | |
| SCZENDZINA: | That's what they [doctors] know ...like if I leave they [leave] because I'm building relationship with them – | |
| ... | | |
| SCZENDZINA: | they [doctors] don't know the agency they know me right? | |
| ... | | |
| SCZENDZINA: | There's not everybody that's gonna do it but... | |
| CW-1: | Yeah. No we don't want we don't want | CW-1 is referring to him and UCE not wanting doctors who do not accept kickbacks. |
| SCZENDZINA: | Yeah there's gonna be plenty who's gonna be doing it because they already | SCZENDZINA is acknowledging there are many doctors who accept kickbacks. |

18. On January 5, 2018, SCZENDZINA contacted CW-1 via telephone regarding a patient referral (non-Medicare). CW-1 inquired if SCZENDZINA knew of any physicians that would accept kickbacks. SCZENDZINA responded that she would look into it.

19. On February 12, 2018, SCZENDZINA met with UCE and CW-1. During the meeting, UCE paid SCZENDZINA $500 in cash for her non-Medicare patient referral. SCZENDZINA further agreed that if she only provided Medicare patient referrals, it would be too suspicious. Set forth below is an excerpt of their conversation:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Um it-it a little bit limits us when we take an insurance that's not a good compensation 'cause [HHA's current management] started asking questions. When we're in charge, basically, you know we know nobody should get all Medicare. That-that looks terrible. | To protect the privacy of HHA Alphas owner, the name was redacted and replaced with HHA's current management. |
| SCZENDZINA: | Yeah I know. [Unintelligible ("UI")] | |
| UCE: | But so basically what we do is we, they all want it but basically what we like to do is say, like okay, we'll take your Medicare and we'll take a couple other ones. | "Other ones" is a reference to other insurance plans that do not pay as well as Medicare beneficiary plans. |
| SCZENDZINA: | Yeah. | |

7

| UCE: | To mix in it and also to make it easy for you. | |
|---|---|---|
| SCZENDZINA: | Yeah. | |
| UCE: | For the ones that don't reimburse so well. | |
| SCZENDZINA: | That's what I told [Individual 1] too because he said go for Medicare. I said that's not gonna look good. | SCZENDZINA is referring to how she spoke with her HHA to mix in other patients with varied insurances, besides Medicare, so governmental oversight agencies would look not closer at her company. |
| UCE: | Right that's exactly. | |
| SCZENDZINA: | It's gonna look like a Medicare fraud. I don't wanna go there. | |
| UCE: | Yeah so we're (UI) | |
| SCZENDZINA: | (UI) you give me two (UI) I give one Medicare. | Outlining how to mix in Medicare beneficiaries to make it less suspicious. |
| UCE: | Yeah so what, so the only limitation we have right now is when CW-1 in charge we can greenlight all of that because we know we can get all these other patients and we're gonna make up bottom line. | |
| SCZENDZINA: | Yeah exactly. | |
| UCE: | It's just right now with [HHA's current management] it's a little bit, a little bit harder. So that's the, that's the only qualifier there and um so uh I have this envelope, five hundred. | UCE provided SCZENDZINA with a $500 cash envelope for her participation. |
| SCZENDZINA: | Thank you. | |

### B. SCZENDZINA REFERS DOCTORS TO UCE AND CW-1

20. SCZENDZINA continued to communicate with UCE and CW-1 via text message and referred doctors who were willing to participate in the scheme. On March 13, 2018 SCZENDZINA and UCE had the following text message exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| CW-1: | Good morning. Looks like [Doctor 1] doesn't feel comfortable now so let's not push him. Have another option for you Ewaleena. Why don't you connect us with the physicians that he knows and we will compensate you for those connections for now and can always bring him on board once we take over in October. | The CW-1 is referring to a doctor who SCZENDZINA had referred to the UCE and the CW-1. |
| SCZENDZINA: | Ok sure | |

8

| | | |
|---|---|---|
| SCZENDZINA: | [A screen shot of a physician's office – "Bhupinder Bhandari M.D. Gastroenterologist in Fremont, California – 3755 Beacon Ave] | SCZENDZINA is referring to a physician that would participate in the kickback for patient scheme. |
| SCZENDZINA: | This one is one of his docs | SCZENDZINA is referring to the screen shot of the doctor in the previous message. SCZENDZINA is stating that the physician accepts kickbacks with the individual she previously recommended to the UCE and the CW-1. |
| SCZENDZINA: | [A screen shot of a physician's office] | SCZENDZINA is referring to another physician, who would participate in the kickback for patient scheme. |
| SCZENDZINA: | This two will do it but don't mention my name, they don't like my doctor [Doctor 2]. Schedule with them and I'm sure they will go for it | SCZENDZINA believes that the two doctors in the screen shots attachments would participate in the kickback for patient scheme with the UCE and the CW-1. |
| CW-1: | Got it | |

21.    On July 3, 2018, SCZENDZINA met with UCE. During the meeting, a discussion was held about SCZENDZINA being compensated on a per patient basis along with how to disguise the Medicare patient referrals by mixing Medicare referrals with referrals from other insurance providers. SCZENDZINA also discussed the need to keep their activities of paying for referrals secret. SCZENDZINA accepted $1,000 cash as a retainer for her continued participation in the scheme in the future. Set forth below is an excerpt of their conversation:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| | I think, I think he said you guys accept everything. Yeah I would say um I'll be happy to get paid per patient. | |
| ... | | |
| UCE: | Between now and October are you good with one month? | |
| SCZENDZINA: | Mmhmm. | |
| UCE: | Okay. What would you like to see in October? | |
| SCZENDZINA: | Um in October, what do you mean? How to give payment? | |
| UCE: | Yeah what would you like? | |
| SCZENDZINA: | Um I think I would I would like the per patient. | SCZENDZINA agrees to be paid per patient referral going forward versus a monthly amount. |

9

| | | |
|---|---|---|
| UCE: | Okay. | |
| SCZENDZINA: | If the more I send obviously I get paid by the patient. | |
| UCE: | Okay. | |
| SCZENDZINA: | Um how I don't know how [CW-1] wants to do it because a lot of places Medicare is different – | |
| UCE: | Mmhmm. | |
| SCZENDZINA: | - than the other insurance – | |
| UCE: | Mmhmm. | |
| SCZENDZINA: | - different so maybe think about what-what you guys wanna what's the difference – | |
| UCE: | Mmhmm | |
| SCZENDZINA: | - that you wanna pay and then I'm happy with that yeah. | |
| UCE: | Okay. So you'd like um uh no problem higher reimbursement for Medi-Medi and. | |
| SCZENDZINA: | Medicare usually (UI) and then the rest I don't care because I usually get Medicare (UI). | SCZENDZINA would like a higher kickback amount for Medicare patient referrals and is less concerned with other insurance provider kickbacks. |
| UCE: | Oh the I-I-I can tell you yes right now. | |
| SCZENDZINA: | Yeah. | |
| UCE: | Yeah that's no problem. | |
| SCZENDZINA: | Yeah thank you. So and then I can get you also I have a Hills Physician. | SCZENDZINA speaks about referring another Doctor to the scheme. |
| UCE: | Okay. | |
| SCZENDZINA: | Uh account and then I have also uh Blue Cross Blue Shield I have a (UI) plenty. | |
| UCE: | Okay (UI). | |
| SCZENDZINA: | So I usually tell them, give us about two of the others and then three Medicare so per-per week I – | |
| UCE: | (UI) | |
| SCZENDZINA: | - will get like – | |
| UCE: | Perfect. | |
| SCZENDZINA: | - two like one (blue cross) one Blue Shield. | |
| UCE: | That we can totally do. | |
| SCZENDZINA: | And then three Medicare so we (UI). | |
| UCE: | Perfect. | |
| SCZENDZINA: | But a little bit more on Medicare yeah. | |
| UCE: | No problem that's perfect we can do that. | |
| SCZENDZINA: | So that way it's not suspicious. | |
| UCE: | Okay sounds good. Alright. | |
| SCZENDZINA: | So that's what we do yeah. | |
| UCE: | Okay perfect so if you're good with that. | |

10

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SCZENDZINA: | So I get you all this so I keep your location this so I give you all the San Jose, all the (UI) from Dublin the uh San Leandro, San Mateo, Berkeley, Oakland. | |
| UCE: | Um Berkeley yeah Berkeley yep, yep. | |
| SCZENDZINA: | Berkeley, Oakland too. | |
| UCE: | Oakland yep absolutely. | |
| SCZENDZINA: | Oakland yeah I will get you all those because we do not service those. | |
| UCE: | Okay. | |
| SCZENDZINA: | So you got all these (UI). | |
| ... | | |
| SCZENDZINA: | If you do this keep it to yourself – | |
| UCE: | Yeah. | |
| SCZENDZINA: | – you know what I mean because this second job that you can lose your license you need to be smart. You do this kind of stuff you can be triple agent. You can be KGB (UI) I don't care right but fucking keep it to yourself I don't need you spreading around like (UI). | SCZENDZINA refers to doctors needing to keep quiet about any payments they receive from marketers/agencies due to the illegal activity of kickbacks for Medicare beneficiary referrals. |

22. On July 30, 2018, SCZENDZINA met with UCE. During the meeting, SCZENDZINA discussed additional physicians to introduce to UCE. SCZENDZINA informed UCE that she had been building relationships so she would have solid working partnerships. SCZENDZINA was paid $1,000 for her continued agreement to participate in the kickback for patient referrals and doctor scheme. During the meeting the following conversations occurred:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SCZENDZINA: | By the time you get ready and go I'll be probably having a solid, I'm working on some ... | SCZENDZINA is referring to making relationships with doctors who are willing to accept kickbacks. "by the time you get ready and go" is in reference to when CW-1 and UCE take over HHA Alpha completely and are able to accept more patient referrals from these doctors. |
| UCE: | Okay. | |
| SCZENDZINA: | happy hours like, you know, just to make little friends | |
| UCE: | Oh yeah? | |
| SCZENDZINA: | like friendly, friendly stuff, and I actually end up having um, happy hour with Dr. Gay | |
| UCE: | Okay. | |
| SCZENDZINA: | So | |

11

| | | |
|---|---|---|
| UCE: | What'd he say? | |
| SCZENDZINA: | Um, well he was pretty open about like oh, you know, no, he was, I think he was like feeling me out, sort of like, you know, I've been hearing, and I'm like, mmm, I don't know anything about it… | |
| UCE: | Hearing about what? What? | |
| SCZENDZINA: | Like, like the people go on payrolls and stuff like that. | "payrolls" is in reference to the practice of doctors who accept kickbacks often go on home health agencies' payrolls, often as medical directors or consultants, to disguise kickback payments and make them appear like legitimate payments |
| UCE: | Okay. | |
| SCZENDZINA: | And I said oh, I have no idea, but this is none, none of my business, right. | |
| UCE: | Yeah. | |
| SCZENDZINA: | I think he was just trying to check it out if I'm… spying on him. I can tell you right now he's on like three different payrolls | This is in reference to Dr. Gay getting paid kickbacks for patient referrals from 3 different agencies |
| … | | |
| UCE: | Yeah. | |
| SCZENDZINA: | you know I mean? If you wanna do it, do it. You're um, you're allowed to make money. | |
| UCE: | Yeah. Yeah. | |
| SCZENDZINA: | But you need to be smart and not talk about it. | |
| … | | |
| SCZENDZINA: | That's all, that's all. So I got, we, we're pretty, like we're now on text pretty good, almost every day. So I told him like Nick, it's pretty simple. A lot of people do what they do. | "Nick" is in reference to GAY. "a lot of people do what they do" is in reference to accepting kickbacks. |
| … | | |
| SCZENDZINA: | So she's, we have a, I mean I have her cell phone, we, we're really, we're almost like good friends. So she would not, she sends me (UI) uh, patients (UI) like she's like the number one mega star for me. Right? | |
| UCE: | Yeah, okay. | |
| SCZENDZINA: | She loves us. So if I tell her hey, put the hospice there, that's it. | |
| UCE: | Done. Okay. | |
| SCZENDZINA: | And with her you don't even have to, you don't even, I'm sure she'll probably be open on some sort of (UI) but um, with her you're gonna be like kind of, like I sit down with her and she's, she's so cool. | |
| UCE: | Okay. | |
| SCZENDZINA: | She's so cool. She's the coolest woman (UI) | |
| UCE: | Okay. Perfect. So what I, what I found is about thirty percent wanna be on contract,… | UCE is referring to a ficticious consulting contract given to Doctors to help conceal the kickback payment. |

12

| | | |
|---|---|---|
| SCZENDZINA: | Mhm. | |
| UCE: | …thirty percent prefer an envelope. | UCE is referring to providing referring physicians with an envelope filled with cash for any Medicare patient referrals. |
| UCE: | I mean, I'm sorry, the rest prefer an envelope. I don't care. | |
| SCZENDZINA: | Yeah. (interruption) | |
| SCZENDZINA: | Yeah. I'll, I will ask her first. | SCZENDZINA agreed to ask a Doctor for their participation in kickback for referral scheme. |

23. On September 15, 2018 through September 18, 2018 SCZENDZINA, via text message, contacted UCE to discuss sending more patients and referring physicians. The following is an excerpt from the text message exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SCZENDZINA: | I will explain what I'm struggling with, I don't have problems sending patients I have plenty ready to go but talking to docs I need more info from you | |
| UCE: | Sure. Let me figure out my schedule for next week. Wednesday possible? | |
| SCZENDZINA: | Yes Wednesday works | |
| UCE: | My Wednesday appointments got moved. Does Thursday work? | |
| SCZENDZINA: | Yes… I have patient for you in October and his wife hospice when can you open them | SCZENDZINA is referring to a patient referral |

24. On September 20, 2018 SCZENDZINA met with UCE. SCZENDZINA discussed additional patients and physicians to refer to UCE. SCZENDZINA also stated that she knew of a home health agency, Medics Choice, which under investigation by the FBI for kickback conduct. UCE paid SCZENDZINA $1,000 in cash during this meeting for her continued involvement in the scheme to refer Medicare Beneficiary patients for kickbacks and introducing other willing participants. The following conversation took place during the meeting:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| SCZENDZINA: | I so I have, I have a potential three doctors and I don't know if maybe you already have them. So one is [DOCTOR 01] from um [location]. He already does AMITY but he's willing to be on the payroll with somebody else cause he's on the payroll with them. | SCZENDZINA is referring to more physicians to participate in the scheme. The DOCTORS information was redacted for their privacy. |

13

| | | |
|---|---|---|
| UCE: | Okay. | |
| SCZENDZINA: | So he's [DOCTOR 01] good with that. Then there's I'm working on [REFERRED DOCTOR 02], who's in uh, uh [location]. | Another Doctor was mentioned to be referred. Their information was redacted for their privacy. |
| UCE: | Okay. | |
| SCZENDZINA: | She's pretty, she's still saying like you maybe I try just sending patients without anything and if I like it then I will you know get some whatever right. And then uh Doctor Massen ... you know him right? | SCZENDZINA is referring to DOCTOR 01 sending patients to HHA Alpha. |
| ... | | |
| SCZENDZINA: | Um they-they auditing them for um Medicare fraud. | |
| UCE: | Well it's beyond auditing. | The UCE is referring to the MEDICS CHOICE investigation being a criminal investigation. |
| SCZENDZINA: | It's FBI. | SCZENDZINA acknowledging she knew the FBI is involved. |
| UCE: | Well. | |
| SCZENDZINA: | They under [Federal Investigation], I know Medic Choice is in trouble. | SCZENDZINA is demonstrating knowledge that other home health care agencies are under investigation for conduct similar to hers. |
| UCE: | No-no-no not-not-not just a check. Three of them got, three of the people in the company got arrested. | |
| SCZENDZINA: | Yeah. | |
| UCE: | And three doctors got arrested. | |
| SCZENDZINA: | Well because they already have they already have uh they already sort of okay so there were three companies that were investigated heavily, it's Amity. | SCZENDZINA is demonstrating knowledge that AMITY is conducting similar offenses as MEDICS CHOICE. |
| ... | | |
| UCE: | U-um the uh the indictment, the FBI indictment is online for, for Medics uh Choice so do you know what they did? The owner told one of the billing clerks to maintain a spreadsheet of every doctor when she took money out of a bank account, which bank account, how much cash they paid, and which patients they got as a result. So in one spreadsheet you basically you might as well have turned that over to yeah so the FBI this person complained to the FBI and turned over that spreadsheet. It was like the entire crime in one document. | |
| SCZENDZINA: | she's an idiot. Yeah. | |
| UCE: | Yeah but she and, and I, and I get it that you know in this business you want, in this business you wanna keep track of things and make sure you're doing okay but that's a stupid fucking document to keep right? | |

14

| | | |
|---|---|---|
| SCZENDZINA: | It's a stupid yeah, yeah Medic Choice, is in deep trouble, you know what we um we just got patients from Medic Choice the other day the Washington is giving us everything from Medic Choice because they said Medic Choice is completely done. | "Washington" is a hospital in Fremont, California. |
| SCZENDZINA: | What an idiot. | |
| UCE: | - two marketers and the owner that all got because the document listed what marketer went on what day and how much cash and what it was like terrible. | |
| SCZENDZINA: | You know what also they were doing wrong is that they were um they were when you called them and your patient and you were having a different insurance than Medicare, they will train the people to tell them to go switch which you don't do that. They will say oh we don't wanna take that uh insurance but if you, if you wanna go and change to Medicare we gladly accept that. And they even offer some patients a five hundred dollars bonus if they switch | |
| ... | | |
| UCE: | one of the guys that was approached he-he used to have a Mercedes from them [MEDICS CHOICE]. | |
| ... | | |
| SCZENDZINA: | And that's when they start questioning like you know what – | |
| UCE: | Oh yeah. | |
| SCZENDZINA: | - it's one thing to get paycheck cause you working right? | |
| UCE: | Yeah. | |
| SCZENDZINA: | But secondly – | |
| UCE: | Who gets a car? | |
| SCZENDZINA: | you get gifts like that, that's kickback | |
| UCE: | Yeah. | |
| SCZENDZINA: | - that's terrible. | |
| UCE: | Yeah, yeah (UI). | |
| SCZENDZINA: | And if you gonna do, do it on the side so nobody knows don't freaking put on spreadsheet oh I gave a Mercedes | |
| ... | | |
| SCZENDZINA: | See what Amity was doing they have fifteen hundred patients a month right. Fifteen hundred. | |
| UCE: | Yeah their census is like fourteen fifteen hundred yeah. | |
| SCZENDZINA: | Even now it went up to two thousand at some point. | |
| UCE: | Two thousand really? | |
| SCZENDZINA: | Yeah. | |
| UCE: | Wow. | |

15

| | | |
|---|---|---|
| SCZENDZINA: | Last Christmas. There the census that (UI) that I was doing tons of good marketing right. And idiots were turning all I mean like on a daily basis they have about uh I think they now have I'd say like five six maybe seven marketers right. So on average they would get like let's say eighty Medicare and then ten of the other. No-no-no that's a mistake you have to do fifty-fifty otherwise you they gonna start questioning you. | |
| ... | | |
| SCZENDZINA: | Yeah well I told them for probably October because that's when you guys gonna open so they wanna you know. | SCZENDZINA is referring to "them" as in physicians she was recruiting to refer patients to HHA Alpha. |
| UCE: | Sure. | |
| SCZENDZINA: | Um some of them just (UI) so call them and then um I think, I think only one person decide to go and the rest that they just gonna stay kind of neutral send it see if they like it if there if they happy then they will talk business. | SCZENDZINA is referring to physicians wanting to do a test run or trial run with HHA Alpha before they discuss the kickback scheme. |
| UCE: | Okay sound. | |
| SCZENDZINA: | But they will still send you patient that's not a problem. | |
| UCE: | Okay. | |
| SCZENDZINA: | And maybe they just a little bit careful because I-I remember when I showed you the letter right. | SCZENDZINA is referring to a letter that was sent to medical professionals in the area warning them of that physicians were being prosecuted for similar conduct and or TARGET OFFENSES. |
| UCE: | Mmhmm. | |
| SCZENDZINA: | Four hundred doctors in the area receive that letter so everybody was pissing their pants you know. | |

25.     During the UCO, SCZENDZINA was paid approximately $500 in kickback payments for the referral of a patient (non-Medicare) and $4,000 for the promise of future Medicare Beneficiary referrals, and for the referral of doctors who were willing to participate in the scheme.

### C. SCZENDZINA ADMITS TO ACCEPTING KICKBACKS FOR THE REFERRAL OF PATIENTS

26.     On July 17, 2019, FBI Special Agents interviewed SCZENDZINA. During the meeting SCZENDZINA was asked if she had ever paid or received kickback payments for the referral of patients. SCZENDZINA initially denied accepting kickbacks in exchange for patient referrals but eventually admitted to

16

receiving kickbacks from UCE and CW-1 as well as from another HHA for patient referrals. After being asked multiple times throughout the interview by FBI Special Agents about SCZENDZINA accepting kickback payments, SCZENDZINA responded "so yes, I did receive the kickback from [HHA Redacted] for patients."

## III. PROBABLE CAUSE FOR THE VIOLATION

### A. TITLE 42 UNITED STATES CODE, SECTION 1320a-7b(b)(1)(A), THE ANTI-KICK BACK STATUTE

27. **Title 42, United States Code, Section 1320a-7b(b)(1)(A),** in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

28. Based on all of the foregoing, probable cause exists to believe that SCENDZINA accepted kickback payments from UCE that were intended to induce SCENDZINA to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

29. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by SINGH for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

30. Therefore, there is probable cause to believe SCENDZINA's agreement to send patient referrals to HHA Alpha in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV. CONCLUSION

31. Based on the foregoing, there is probable cause to believe SCZENDZINA accepted payments of kickbacks in exchange for the agreement to send patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

## V. REQUEST FOR SEALING

32. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in

the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

James Gawrych, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 3rd day of September, 2019.

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge

18